**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MICHAEL LA SHAWN MCCARY, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 21-340 |
| | ) | |
| v. | ) | Magistrate Judge Maureen P. Kelly |
| | ) | |
| SUPERINTENDENT MICHAEL R. CLARK; | ) | Re: ECF No. 5 |
| JOSH SHAPIRO, *Pennsylvania Attorney* | ) | |
| *General*; *and* | ) | |
| DISTRICT ATTORNEY OF ALLEGHENY | ) | |
| COUNTY, | ) | |
| | ) | |
| Respondents. | ) | |

### MEMORANDUM OPINION

For the reasons that follow, the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "Petition"), ECF No. 5, will be denied. A certificate of appealability also will be denied.[1]

Michael La Shawn McCary ("Petitioner") is a state prisoner currently incarcerated at the State Correctional Institution at Benner Township ("SCI-Benner") in Bellefonte, Pennsylvania.

Petitioner initiated this action by submitting a *pro se* federal habeas petition, ECF No. 1, which was received by this Court on March 12, 2021. On April 6, 2021, the Petition was formally filed after Petitioner corrected certain formal deficiencies in the original submission. ECF No. 5. On the same date, Petitioner sought leave to file an amended habeas petition. ECF No. 7. The request was granted. ECF No. 8. Petitioner sought an extension of time to do so, which also was granted. ECF Nos. 11 and 12. However, Petitioner never submitted an amended petition, opting

---

[1] The Parties consented to the jurisdiction of a United States Magistrate Judge on August 23, 2024. ECF Nos. 19 and 26.

instead to file a Memorandum of Law in support of his initial Petition. ECF No. 14. Accordingly, the initial Petition remains the operative pleading in this case. ECF No. 5.

Respondents ultimately answered the Petition on October 12, 2021. ECF No. 23. Petitioner did not file a Traverse, despite being explicitly informed that he was entitled to do so. ECF No. 24; see also LCvR 2254.E.2. The Petition is ripe for adjudication.

In the Petition, Petitioner attacks his 2009 conviction of Murder of the First Degree, in violation of 18 Pa. C.S.A. § 2502(a), in the Court of Common Pleas of Allegheny County, Pennsylvania. Docket, Com. v. McCary, No. CP-02-CR-3770-2008 (C.C.P. Allegheny Cnty.) (available at https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-02-CR-0003770-2008&dnh=8zBGoWu%2Fzh3VMmsCMIVddQ%3D%3D (last visited Aug. 29, 2024)). His conviction came after a two-day bench trial before Judge David Cashman.

On April 20, 2009, Petitioner was sentenced to a mandatory term of life imprisonment without parole. ECF No. 23-1 at 32. See also Sentencing Hr'g Tr. dated Apr. 20, 2009, at 3.

I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following is a recitation of relevant factual history underlying Petitioner's conviction from the Pennsylvania Superior Court's opinion on direct appeal.

> In the early morning hours of May 27, 2005, McCary emerged from an alley and approached Kenneth Waller ("Waller") and David Wadley ("Wadley") as the two men walked on Penn Avenue in Pittsburgh, Pennsylvania. As McCary approached the two men, Waller said to Wadley, "Here goes the shit now." N.T., 1/15-21/09, at 20. An argument ensued between Waller and McCary. At Wadley's urging, Waller and Wadley walked away, but McCary followed the men, continuing his argument with Waller. In its Opinion, the trial court described what next transpired:
>
>> McCary approached Waller, and the two essentially began a shadow boxing type movement. Wadley testified that Waller was backpedaling in an effort to avoid getting hit. Waller, in fact, came out of one of his shoes in an effort to avoid contact with McCary.

> At this point, Wadley observed a shiny object in McCary's hand. Wadley described McCary's arm swinging down, and Wadley heard two pops. As Wadley approached Waller, McCary began heading in the other direction. Waller told Wadley he was hurt, and Wadley observed that Waller was bleeding. Wadley attempted to help Waller walk away from the area and observed at this point that Waller was "bleeding bad." Wadley tried to help Waller walk to a hospital. At some point, Waller was unable to walk any further. Waller went to the ground at 132 South Graham, where police and emergency medical personnel later found him.... The police later showed Wadley a photographic array, where he identified McCary's photograph.

> Trial Court Opinion, 4/4/11, at 4-5. Waller remained in the hospital from May 27, 2005 to July 6, 2005. After being transferred to Kane Hospital, Waller remained unconscious and non-responsive. Waller died from his injuries on December 22, 2005. An autopsy disclosed that Waller had sustained a stab wound to his neck, just below his right ear. Waller died as a result of anoxic brain injury, secondary to cardiac arrest, resulting from the stab wound to his neck.

Super. Ct. Direct App. Op., ECF No. 23-1 at 172-73.

The Superior Court also recited some additional facts relevant to the present matter in its opinion affirming the denial of post-conviction relief under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. § 9541 et seq.

> Pertinent to this appeal, McCary had twice been committed to Western Psychiatric Institute and Clinic ("WPIC"), both of which occurred within one month of the incident at issue.[3] Trial counsel requested the records three days before trial began on January 15, 2009, but he did not receive the documents until January 20, 2009. One day later, which was the last day of the bench trial, the court found McCary guilty of first-degree murder. The court then sentenced McCary to the mandatory term of life imprisonment without the possibility of parole.

> [3] The first was an involuntary commitment that occurred from April 21, 2005 to April 28, 2005. The second was a voluntary commitment from May 23, 2005, to May 26, 2005. *See* Amended Petition for Relied [*sic*] Pursuant to the Post Conviction Relief Act, 11/9/2015, at Appendix C1-13 and E1-11. The discharge of the later

3

commitment was against medical advice and occurred within 24 hours of the assault.

Com. v. McCary, No. 101 WDA 2019, 2020 WL 41924, at *1 and n.3 (Pa. Super. Ct. Jan. 3, 2020) (footnote 3 as in the original).

Petitioner timely filed a notice of direct appeal on May 14, 2009, represented by trial counsel. ECF No. 23-1 at 33-36. During the course of the appeal, Petitioner filed a *pro se* motion seeking remand and the appointment of new counsel, or leave to proceed *pro se* on September 9, 2010. Id. at 71. On September 16, 2010, the Superior Court granted the motion, and ordered the Court of Common Pleas to hold a hearing pursuant to Commonwealth v. Grazier, 713 A.2d 81 (Pa. 1998), in order to determine whether Petitioner's request to proceed *pro se* was knowing, intelligent, and voluntary. ECF No. 23-1 at 73.

According to the record, it appears that a Grazier hearing was held on December 16, 2010 before Judge Cashman,[2] at which the following exchange took place.

> THE COURT:  Mr. McCary, I have a motion for appointment of a new director [*sic*] of counsel and a second motion filed by - - is it your desire to have new counsel appointed for you in connection with your direct appeal?

> THE DEFENDANT:  Yes, sir.  Can I please have new appellate counsel, sir?  I don't know enough about the law to represent myself, and, sir, can I please have new - -

> THE COURT:  I just want to get it clear.  You don't want to represent yourself.

> THE DEFENDANT:  I don't know enough about the law.  I'm mentally ill and currently in a mental health unit at the county jail, sir.  Can I please have a new appellate counsel?

Grazier Hr'g Tr. dated Dec. 16, 2010, at 2-3.  The trial court granted prior trial counsel leave to

---

[2] In the interim, Petitioner filed multiple *pro se* motions and briefs in support of his appeal and the appointment of new counsel on direct appeal.  ECF No. 23-1 at 50-70 and 75-77.

withdraw, and appointed the Allegheny County public defender to represent Petitioner on direct appeal. ECF No. 23-1 at 78.

On direct appeal, Petitioner raised the following claim:

> WAS THE EVIDENCE INSUFFICIENT TO ESTABLISH THAT MR. MCCARY WAS THE PERPETRATOR OF THE INCIDENT IN QUESTION, AND THAT THE PERPETRATOR OF THE INCIDENT IN QUESTION COMMITTED A WILLFUL, DELIBERATE AND PREMEDITATED KILLING?

Id. at 105. The trial court parsed this stated claim as two distinct sufficiency of the evidence claims – the first that the prosecution had failed to establish that Petitioner was the individual who killed the victim, and the second that the prosecution had failed to establish the specific intent to kill necessary for a finding of first-degree murder. Id. at 92. The trial court opined that the evidence presented at trial was sufficient to convict Petitioner on both bases. Id. at 95-97.

The Superior Court denied Petitioner's direct appeal and affirmed his conviction and sentence on June 4, 2012. Id. at 172. As to Petitioner's identity, it held that Wadley's testimony was sufficient to identify Petitioner as the man who stabbed the victim. Id. at 175-76. As to specific intent, the Superior Court adopted the trial court's reasoning that Wadley's testimony regarding seeing a "silver gleaming object prior to hearing two pops," followed by evidence of "an enormous loss of blood sustained by [the victim]" demonstrated that Petitioner used a deadly weapon on a vital part of the victim's body, which is sufficient to establish the specific intent to kill under Pennsylvania law. Id. at 177.

Petitioner sought leave to appeal from the Pennsylvania Supreme Court on December 19, 2011. Id. at 179. Allocatur was denied on May 14, 2012. Id. at 180 and 230. The record does not indicate that Petitioner filed a petition for writ of certiorari with the United States Supreme Court. Accordingly, his conviction became final on August 13, 2012 – the deadline for doing so. U.S. Sup. Ct. R. 13.

However, on July 13, 2012, Petitioner filed a *pro se* PCRA petition.[3]  ECF No. 23-1 at 231 and 238.  Petitioner filed an amended *pro se* PCRA petition on November, 27, 2012.  Id. at 239, 245 and 260.  Counsel was appointed, and the prosecution was ordered to show good cause why a hearing should not be granted, on March 1, 2013.[4]  Id. at 261.  Alice Applegate, Ph.D. ultimately was appointed by the PCRA trial court as an expert for Petitioner, id. at 312-14, and Petitioner submitted a counseled amended PCRA petition on November 9, 2015.  Id. at 315.

In the amended PCRA petition, Petitioner raised two grounds for relief.

> 1.   Trial counsel was ineffective in failing to investigate Mr. McCary's psychiatric history, procure copies of his medical records, obtain an opinion from an expert in the field, and request a competency hearing.
>
> 2.   Trial counsel was ineffective in failing to investigate Mr. McCary's psychiatric history, procure copies of his medical records, obtain an opinion and testimony from an expert in the field, and present a diminished capacity defense at trial.

Id. at 318 and 327.  The amended PCRA petition was supported by an affidavit by Dr. Applegate, who conducted a forensic psychological examination of Petitioner on April 4, 2015, as well as some of Petitioner's medical records.[5]  Id. at 340-388 and 491.

The prosecution answered the amended PCRA petition on June 3, 2016.  Id. at 397.  On the prosecution's motion, id. at 430, the PCRA trial court ordered Petitioner to participate in an

---

[3] Because Pennsylvania applies the so-called "prisoner mailbox rule" to *pro se* PCRA petitions, see, e.g., Com. v. Little, 716 A.2d 1287, 1288-89 (Pa. Super. Ct. 1998), the effective date of filing appears to be July 13, 2012 – the date on which the certificate of service states that that petition was mailed.  ECF No. 23-1 at 238.

[4] Petitioner also moved for another Grazier hearing, which was received by the PCRA trial court on March 6, 2013.  Id. at 262.  However, it appears that Petitioner mailed it prior to the appointment of counsel.  Id. at 263.  The record does not indicate that it ever was addressed.

[5] Expert reports submitted on behalf of Petitioner and the prosecution were not included in the portion of the state court record that was filed on the public docket.  Instead, they were included in the paper record provided by Respondents, and were thoroughly reviewed by this Court.

independent mental health evaluation, which was conducted on December 10, 2016, by Bruce A. Wright, M.D.  Id. at 456 and 460.  Dr. Wright completed his report of the evaluation on March 6, 2018. Id. at 491.

On November 16, 2018, no PCRA hearing had yet taken place.  Id. at 479.  Because Petitioner's competency was at issue, the prosecution sought to have Petitioner produced for an examination by Dr. Wright regarding his competency to proceed with a PCRA hearing.  Id. at 481 and 483.  Petitioner also sought appointment of Dr. Applegate to conduct her own examination of Petitioner's competency to participate in the hearing.  Id. at 489-92.

On December 11 and 12, 2018, the PCRA trial court held hearings as to Petitioner's competency to participate in the PCRA process, as well as the merits of his PCRA petition.  Both Dr. Applegate and Dr. Wright testified as to Petitioner's competency to proceed with the petition – with Dr. Applegate opining that Petitioner was not competent, and Dr. Wright opining that Petitioner "does not have any formal thought disorder that would adversely affect his capacity to understand the proceedings at this time."  Competency Hr'g and PCRA Hr'g Tr. dated Dec 11-12, 2018, at 23 and 97.  The PCRA trial court ultimately found that Petitioner was competent to proceed with the PCRA hearing.  Id. at 117.

Next, the hearing turned toward the merits of the PCRA petition.  Dr. Applegate, Dr. Wright, and trial counsel testified.  Dr. Applegate testified both that Petitioner was not competent to stand trial, and that he did not have the capacity to form the specific intent to kill at the time of the murder.[6]  Id. at 140-43.  Dr. Wright testified that there was no evidence to suggest that Petitioner did not understand the charges against him, roles of the parties, or could not cooperate

---

[6] As the Superior Court noted, Dr. Applegate did not include her opinion regarding Petitioner's alleged diminished capacity in her written expert reports, but instead raised it for the first time at the PCRA hearing.  McCary, 2020 WL 41924, at *6 n.7.

and assist with his defense at the time of trial, or that he lacked the capacity to form the intent to kill at the time of the murder. Id. at 183-86.

Petitioner's trial counsel, Attorney Owen Seman, also testified at the hearing. He stated that he met with Petitioner half a dozen times before trial, that Petitioner did not seem mentally ill, that they developed the strategy for trial together, and that Petitioner seemed to have reasons for the decisions that he made regarding trial strategy. Id. at 213, 217-18, and 226. He never thought that a competency hearing was necessary, but would have taken action if he had thought that Petitioner was incompetent. Id. at 227.

Trial counsel discovered that Petitioner had been in a mental hospital sometime prior to trial, received Petitioner's authorization to request his records on January 10, 2009, and received the records on January 20, 2009. Id. at 208. Counsel stated that he would have requested the records earlier had he known that they existed, in order to prepare for trial. Id. at 221-22. Counsel believed that he would have discussed the records with Petitioner, but did not recall the specific discussion. Id. at 224. However, they would have discussed Petitioner testifying regarding his participation in order to receive a lesser sentence, and counsel specifically recalled discussing the possibility of voluntary manslaughter with Petitioner. Id. at 220 and 225. Petitioner refused to admit culpability – at least when voluntary manslaughter was discussed – and maintained his innocence when he discussed the events at issue. Id. at 220 and 228.

Petitioner did not testify at the hearing.

On December 20, 2018, the PCRA trial court denied post-conviction relief. ECF No. 23-1 at 496.

Petitioner timely filed a Notice of Appeal on January 16, 2019. Id. at 497-98. The PCRA trial court issued its opinion on April 18, 2019. Id. at 509. In its opinion, the PCRA trial court

acknowledged Petitioner's "long history of psychiatric issues," id. at 515, but concluded from the

evidence of record that, at the time of trial,

> it was clear that McCary was fully aware of the nature of the
> proceeding in which he was involved and could clearly and
> adequately communicate with his counsel and assist his counsel in
> the trial of his case. His counsel advised him of the nature of the
> charge, advised him of the possible penalties with respect to each
> level of the charge of criminal homicide, and formulated a defense
> with McCary based upon his vehement assertion that he did not
> commit his homicide. A review of the record in this case clearly
> demonstrates that there was no need for a competency hearing to be
> held prior to the time of McCary's trial because *he was fully able to
> understand the proceedings and assist his counsel in the handling
> of those proceedings.*

Id. at 518-19 (emphasis added).

The PCRA trial court further found no ineffective assistance on the part of trial counsel for

not raising a diminished capacity defense because Petitioner did not acknowledge his involvement

in the killing, as is required under state law to raise such a defense.  Id. at 519 (citing Com. v.

Hutchinson, 25 A.3d 277, 312 (Pa. 2011)).

In the PCRA appeal, Petitioner abandoned his competency claim, and proceeded with a

single argument that trial counsel allegedly was ineffective for failing to investigate Petitioner's

mental health history and raise a diminished capacity defense at trial.

> THE COURT ERRED IN DENYING APPELLANT'S AMENDED
> PETITION FOR RELIEF PURSUANT TO THE POST
> CONVICTION RELIEF ACT BECAUSE TRIAL COUNSEL
> RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO
> INVESTIGATE APPELLANT'S PSYCHIATRIC HISTORY,
> PROCURE COPIES OF HIS MEDICAL RECORDS, OBTAIN AN
> OPINION FROM AN EXPERT IN THE FIELD OF FORENSIC
> PSYCHIATRY, AND PRESENT A DIMINISHED CAPACITY
> DEFENSE AT TRIAL.

ECF No. 23-1 at 528.

On January 3, 2020, the Superior Court affirmed the denial of PCRA relief. McCary, 2020 WL 41924, at *1.  In doing so, the Superior Court analyzed the record regarding Petitioner's competency during the time of trial, and reiterated the PCRA trial court's conclusions. Id. at *6.

The Superior Court reproduced the PCRA trial court's characterization of the expert testimony from the hearing.

> At the time of the hearing on McCary's petition for post-conviction relief, both Alice Applegate, Ph.D. and Bruce Wright, M.D., testified as to their views as to McCary's competency at the time of his trial and at the time of his hearing on his petition for post-conviction relief. In addition to having their testimony, this Court also had the benefit of Dr. Applegate's [55]-page report and Dr. Wright's [21]-page report. Both Dr. Applegate and Dr. Wright were questioned as to whether or not McCary was competent to engage in the hearing on the petition for post-conviction relief prior to any discussion taking place as to his competency to proceed to trial in 2009. Dr. Applegate maintained that based upon her testing of McCary and her interaction with him, that he was incompetent not only for the post-conviction proceeding but, also, for trial. Dr. Wright on the other hand, maintained that McCary was competent and as observed by other professionals he was manipulative in how he handled certain things, including as to whether or not he could proceed with his case. It was Dr. Applegate's opinion that McCary was not competent to participate in his ongoing legal defense despite his positive working relationship with his current lawyer. Dr. Wright was of the opinion that McCary has a history of manipulative behavior and demonstrated that manipulative behavior when he engaged in a deliberate attempt to appear more impaired than he was. Dr. Wright reviewed Dr. Applegate's report and her testing and indicated that although he would agree with Dr. Applegate if that were the only records upon which he had to rely, the other psychiatric records including his progress reports at SCI Rockford, told him that McCary was competent and understood the legal process and was able to assist his counsel in preparing for trial.
>
> When Dr. Wright was asked about whether or not McCary was competent to stand trial in 2009, he disagreed with Dr. Applegate who maintained that he was not and Dr. Wright suggested that McCary's manipulative behavior to him in submitting a third personality disorder, whereas his responses to the questions that were asked by this Court in his waiver of a right to a jury trial and

> his responses after he was found guilty indicate that he was fully
> aware of the nature of the proceeding in which he was involved and
> that his inquiries were appropriate and insightful for his particular
> position.

McCary, 2020 WL 41924, at *5.

The Superior Court also recited the PCRA trial court's characterization of the testimony of

trial counsel, Attorney Seman.

> Seman's testimony was that McCary had the ability to consult with
> him with a reasonable degree of understanding of the charges filed
> against him and he participated in formulating his defense and he
> understood the nature and object of these particular proceedings. As
> Seman testified, he fully explained to McCary the charge of criminal
> homicide and the various possible results and their penalties. Seman
> also testified that he suggested to McCary that the charge of
> voluntary manslaughter might be appropriate if he would
> acknowledge that he was responsible for the death of the victim,
> however, *McCary was adamant about the fact that he did not*
> *commit this homicide. In light of McCary's position that he was*
> *not the murderer, Seman was left with the defense upon which*
> *they both agreed, that being, that McCary was being misidentified*
> *as that individual.*
>
> Further acknowledging McCary's understanding of the proceedings
> was his testimony at the time of the *Grazier* hearing. McCary
> advised this Court that he wanted new counsel because he did not
> know enough about the law to adequately represent himself and that
> he wanted a court-appointed lawyer. He believed that Mr. Seman
> was "a hell of a lawyer and a hell of a guy", however, he was busy
> and he wanted someone else to handle his appeal. He was cognizant
> of the fact that if his issues were not set forth in the concise statement
> of matters complained of on appeal that they would be waived.
> *Seman further testified that in hindsight he reviewed the fact that*
> *McCary had some psychiatric issues and it might have been*
> *helpful in formulating a defense to the charge of criminal*
> *homicide, however, it would have been of no benefit to him in light*
> *of McCary's insistence that he did not commit this homicide.*
> Based upon all of the information that he knew at that time and
> McCary's insistence that he was not the murderer, he followed the
> course of action that both he and McCary had agreed upon.

Id. at *5 (emphasis added).  Additionally,

11

Trial counsel testified: (1) he met with McCary at least six times; (2) he relied upon McCary's steadfastness on not being the perpetrator and McCary's unwillingness to pursue other trial strategies like voluntary manslaughter; (3) he was not told until later on that McCary had been committed WPIC; and (4) he got along well with McCary, McCary participated in his defense, and nothing jumped out about McCary that gave him pause.[8] *See* N.T., 12/11/2018-12/12/2018, at 217, 220-221, and 225-226.

[8] When asked what prompted counsel to request the medical record, he stated:

> I'm not sure, to be perfectly honest, as I think back on it. I don't know if Mr. McCary made a mention to me that right before this - - because had I known that these records existed, I would have asked for them a while before. But when I requested these, I remember something came up that -- I don't know if it was in conversation that me and Mr. McCary talked about it, and he said, oh, I had just been released from Western Psych, something along those lines, and I made the request to see if that was accurate, and it turns out it was.

N.T., 12/11/2018-12/12/2018, at 221.

Id. at *7 and n.8 (footnote 8 as in the original).

After reiterating the PCRA trial court's conclusion that Petitioner was competent at the time of trial, the Superior Court adopted the PCRA trial court's conclusion that trial counsel was not ineffective for failing to investigate and present a diminished capacity defense because Petitioner refused to acknowledge his involvement in the killing.

> The second claim of ineffectiveness is predicated upon Seman's failure to interpose diminished capacity testimony. The defendant did not testify at the time of trial nor did he call any witnesses. In order for him to avail himself of the diminished capacity defense, he had to acknowledge the fact that he was responsible for the death of his victim. In ***Commonwealth v. Hutchinson***, 25 A.3d 277, 312 (Pa. 2011), the Pennsylvania Supreme Court acknowledged when the defense of diminished capacity would be available to a defendant.

> A defense of diminished capacity, whether grounded in mental defect or voluntary intoxication,

12

is an extremely limited defense available only to those defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill. ***Commonwealth v. C. Williams***, 602 Pa. 360, 980 A.2d 510, 527 (2009); [*C*]***ommonwealth v.*** [*G*]***ibson***, 597 PA. 402, 951 [A].2d 1110, 1131 (2008); ***Commonwealth v. Spotz***, 587 Pa. 1, 896 A.2d 1191, 1218 (2006) ("Absent an admission from [the defendant] that he had shot and killed [the victim], trial counsel could not have presented a diminished capacity defense.")[.] If a defendant does not admit that he killed the victim, but rather advances an innocence defense, then evidence on diminished capacity is inadmissible. ***Commonwealth v. Laird***, 605 Pa. 137, 988 A.2d 618, 632 (2010).

The import of the defense of diminished capacity is that evidence of someone's diminished capacity will entitle a fact-finder to come to the conclusion that the individual lacked the specific intent to kill somebody thereby negating the imposition of a first-degree murder verdict. When an individual maintains that he did not commit the crime, there is no ability to interpose the defense of diminished capacity.

McCary's defense was that he did not commit the homicide and, accordingly, evidence of diminished capacity was irrelevant and inadmissible in this trial and his counsel could not have been ineffective for failing to introduce that inadmissible evidence.

PCRA Court Opinion, 4/18/2018, at 7-12. We conclude that the trial court's opinion properly disposes of the issue in this case. Accordingly, we affirm on the basis of that opinion, while adding the following comments [relating to conclusions of the PCRA trial court based on competing expert testimony, as well as the credibility of trial counsel's testimony].

Id. at *6-7.

Following the denial of his PCRA appeal by the Superior Court, Petitioner timely sought leave to appeal from the Pennsylvania Supreme Court. ECF No. 23-1 at 636. *Allocatur* was denied on August 3, 2020. Id. at 692.

## II.   FEDERAL HABEAS PETITION

In the Petition, ECF No. 5, Petitioner asserts two grounds for relief.

Ground One:      Petitioner was denied his rights under the Sixth and Fourteenth Amendments wherein trial counsel failed to investigate psychiatric history procure mental health records and present a diminish [*sic*] capacity defense[.]

(a) Supporting facts[:]

Petitioner has an extensive history of mental illness.  Petitioner was discharged from mental health facility against medical advice (AMA). Within 24 hrs. the deadly assault occurred.  Essentially, on the eve of trial Counsel sought mental health records, yet still commenced with trial without the benefit of reviewing and investigating Petitioner's extensive mental health history[.]

Id. at 5.

Ground Two:      Evidence was insufficient not prove each and every element of criminal homicide beyond a reasonable doubt as required by the Sixth Amendment.

(a) Supporting facts [:]

The Commonwealth presented a witness who failed to make an in-court identification and whose testimony was so inconsistence and unreliable.

Id. at 7.

Petitioner also submitted a Memorandum of Law in support of the Petition.  ECF No. 14. While not properly part of the Petition, Respondents interpret the Memorandum as raising four additional claims.  ECF No. 23 at 14.  These are:

Ground Three:    The PCRA Court erred in denying Petitioner's PCRA petition.  See ECF No. 14 at 8.

Ground Four:     Petitioner entered an involuntary waiver of his right to a jury trial.  Id. at 11.

Ground Five:     Petitioner was unlawfully sentenced to life imprisonment without the possibility of parole.  Id.

Ground Six:      Trial counsel lacked the requisite education and experience required to represent a capital defendant.[7] Id. at 17.

Strictly speaking, any claim not raised in the Petition is not properly before this Court. See Rules Governing Section 2254 Cases 2(c)(1) ("The petition must: (1) specify all the grounds for relief available to the petitioner[.]"). See also LCvR 2254.B.2.b (same). However, out of an abundance of caution, Grounds Three through Six will be addressed.

## III.  PROCEDURAL ISSUES

Before the Court addresses the merits of Petitioner's federal habeas claims, it will address whether the Petition fulfills the applicable procedural requirements, as set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA").

### A.  The AEDPA Statute of Limitations

The first consideration in reviewing a federal habeas corpus petition is whether the petition was timely filed within the applicable statute of limitations. In 1996, Congress enacted the AEDPA, which generally established a strict one-year statute of limitations for the filing habeas petitions pursuant to 28 U.S.C. § 2254. The applicable portion of the statute is as follows:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

---

[7] There is no indication in the state court record provided by Respondents or the electronic state court docket for Petitioner's underlying criminal case suggesting that the prosecution ever filed the Rule 802 Notice of Aggravating Circumstance necessary for the death penalty to have been a possibility.

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

The United States Court of Appeals for the Third Circuit has held that the statute of limitations set out in Section 2244(d) must be applied on a claim-by-claim basis. Fielder v. Varner, 379 F.3d 113, 122 (3d Cir. 2004), cert. denied sub nom. Fielder v. Lavan, 543 U.S. 1067 (2005). Thus, in analyzing whether a petition for writ habeas corpus has been timely filed under the one-year limitations period, a federal court must undertake a three-part inquiry. First, the court must determine the "trigger" date for the individual claims raised in the petition. Typically, this is the date that the petitioner's direct review concluded and the judgment became "final" for the purposes of triggering the one-year period under Section 2244(d)(1)(A). Second, the court must determine whether any "properly filed" applications for post-conviction or collateral relief were pending during the limitations period that would toll the statute pursuant to Section 2244(d)(2). Third, the court must determine whether any other statutory exception or equitable tolling should be applied based on the facts presented. See, e.g., Munchinski v. Wilson, 807 F. Supp. 2d 242, 263 (W.D. Pa. 2011), aff'd, 694 F.3d 308 (3d Cir. 2012) (citing Nara v. Frank, No. 99-5, 2004 WL 825858, at *3 (W.D. Pa., Mar. 10, 2004)).

In the instant case, Respondents concede that the Petition is timely filed.  ECF No. 23 at 18.  A review of the record, as set forth above, supports this conclusion.  Therefore, the Court finds that Petitioner's claims are timely.

### B. Exhaustion and Procedural Default

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief.  To comply with the exhaustion requirement, a state prisoner first must have fairly presented his constitutional and federal law issues to the state courts through direct appeal, collateral review, state habeas proceedings, mandamus proceedings, or other available procedures for judicial review.  See, e.g., Castille v. Peoples, 489 U.S. 346, 351 (1989); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996) (abrogated on other grounds by Beard v. Kindler, 558 U.S. 53, 60-61 (2009)); Burkett v. Love, 89 F.3d 135, 137 (3d Cir. 1996).  To fairly present a claim, "[b]oth the legal theory and facts underpinning the federal claim must have been presented to the state courts." Evans v. Court of Common Pleas, Delaware Cnty., 959 F.2d 1227, 1231 (3d Cir. 1992).

Moreover, a petitioner must present every claim raised in the federal petition to the state's trial court, intermediate appellate court, and highest available court before exhaustion will be considered satisfied.  O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004).  A petitioner shall not be deemed to have exhausted state remedies if he has the right to raise his claims by any available state procedure. 28 U.S.C. § 2254(c). The petitioner has the burden of establishing that the exhaustion requirement has been met.  Ross v. Petsock, 868 F.2d 639, 643 (3d Cir. 1989); O'Halloran v. Ryan, 835 F.2d 506, 508 (3d Cir. 1987).

In the instant case, it is clear that Petitioner's claims are exhausted at the state court level at the very least in the sense that there is no state avenue for relief available to him due to the PCRA's one-year statute of limitations. See 42 Pa. C.S.A. § 9545(b).

However, beyond the question of exhaustion, a federal court may be precluded from reviewing habeas claims under the "procedural default doctrine." Gray v. Netherland, 518 U.S. 152, 162 (1996); Coleman v. Thompson, 501 U.S. 722, 732 (1991); Doctor, 96 F.3d at 678; Sistrunk v. Vaughn, 96 F.3d 666, 675 (3d Cir. 1996). This doctrine is applicable where, *inter alia*, a petitioner's claims are "deemed exhausted because of a state procedural bar[.]" Lines v. Larkin, 208 F.3d 153, 160 (3d Cir. 2000). Like the exhaustion requirement, the procedural default doctrine was developed to promote our dual judicial system. In turn, it is based upon the "independent and adequate state law grounds" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment. Coleman, 501 U.S. at 750.

The PCRA's one-year statute of limitations has been held to be an "independent and adequate" state law ground for denying federal habeas relief. Whitney v. Horn, 280 F.3d 240, 251 (3d Cir. 2002). So too has the requirement under 42 Pa. C.S.A. § 9544(b) that "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." Garcia v. Adams, No. 17-CV-5249, 2019 WL 8015127, at *6 (E.D. Pa. Aug. 27, 2019), report and recommendation adopted, 2020 WL 868200 (E.D. Pa. Feb. 20, 2020), aff'd sub nom. Garcia v. Sup't Forest SCI, No. 20-1570, 2022 WL 1153122 (3d Cir. Apr. 19, 2022) (citing cases).

The United States Supreme Court has held that where a petitioner has to failed to follow state procedure within the required time period, the "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750; see also Wainwright v. Sykes, 433 U.S. 72, 86-87 (1977) (failure to follow state's procedural rules results in procedural default, which bars federal review of petitioner's claims unless he can show cause and prejudice); Hull v. Freeman, 991 F.2d 86, 90-91 (3d Cir. 1993) (same).  The Supreme Court in Coleman further stated that it recognized "the important interest in finality served by state procedural rules and the significant harm to the States that results from the failure of federal courts to respect them."  501 U.S. at 750.

The Supreme Court has defined "cause" as "some objective factor external to the defense." Murray v. Carrier, 477 U.S. 478, 488 (1986).  "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or . . . some interference by officials" are two examples, but not an exhaustive list.  Id.

In order to show a fundamental miscarriage of justice, the Supreme Court requires a petitioner to demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 321 (quoting Murray, 477 U.S. at 496).  Under this standard, a petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."  Schlup, 513 U.S at 324. Once such evidence is presented, a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  Id. at 327.

As discussed more thoroughly above, Grounds One, Two and Three (to the extent that it is Petitioner's intent to raise it here) were presented to the state courts. But, as also set forth above, Grounds Four, Five, and Six were not. See, e.g., ECF No. 23-1 at 105 and 528. Grounds Four, Five, and Six (to the extent that Petitioner intends to raise them), therefore, are not exhausted. Also, because of the PCRA's one-year statute of limitation, they are  procedurally defaulted as well.

Petitioner does not raise any argument regarding cause and prejudice of a miscarriage of justice. This Court further was unable to locate any indication of the same of the same in its independent review of the pleadings and the underlying state court record. Therefore, there is no basis to set aside default, and Grounds Four, Five, and Six will be dismissed.

## IV.   ANALYSIS OF THE MERITS OF REMAINING CLAIMS

Where the state court has reviewed a federal issue presented to them and disposed of the issue on the merits, and that issue also is raised in a federal habeas petition, the AEDPA provides the applicable deferential standard by which the federal habeas court is to review the state court's disposition of that issue. See 28 U.S.C. § 2254(d) and (e).

In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court expounded upon the standard found in 28 U.S.C. § 2254(d). The Supreme Court explained that Congress intended that habeas relief for errors of law may only be granted in two situations: 1) where the state court decision was "contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States" or 2) where that state court decision "involved an unreasonable application of[] clearly established Federal law as determined by the Supreme Court of the United States." Id. at 404-05 (emphasis deleted).

A state court decision can be contrary to clearly established federal law in one of two ways. First, the state courts could apply a wrong rule of law that is different from the rule of law required by the United States Supreme Court.  Second, the state courts can apply the correct rule of law but reach an outcome that is different from a case decided by the United States Supreme Court where the facts are indistinguishable between the state court case and the United States Supreme Court case.  Lambert, 387 F.3d at 234 (quoting Williams, 529 U.S. at 405-06).

In addition, the United States Court of Appeals for the Third Circuit has explained that "Circuit precedent cannot create or refine clearly established Supreme Court law, and lower federal courts 'may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct.'"  Dennis v. Sec., Pa. Dep't of Corrs., 834 F.3d 263, 368 (3d Cir. 2016) (quoting Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam)).  As the Supreme Court has further explained: "[s]ection 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." White v. Woodall, 572 U.S. 415, 428 (2014).

The AEDPA also permits federal habeas relief where the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

Specific factual determinations by the state court that are subsidiary to the ultimate decision to grant post-conviction relief are subject to the presumption of correctness, and must be overcome by a petitioner by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  See also Lambert, 387 F.3d at 235-236.  The Third Circuit has declined to adopt a "rigid approach to habeas review of

state fact-finding." Id. at 236 n.19.  If a state trial court and appellate court make conflicting factual findings, the habeas court must defer to the findings of the higher court – regardless of the propriety of those findings under state law – unless they are rebutted by clear and convincing evidence. Rolan v. Vaughn, 445 F.3d 671, 680 (3d Cir. 2006).

It is a habeas petitioner's burden to show that the state court's decision was contrary to or an unreasonable application of United States Supreme Court precedent and/or an unreasonable determination of the facts.  Ross v. Atty. Gen. of State of Pennsylvania, No. 07-97, 2008 WL 203361, at *5 (W.D. Pa. Jan. 23, 2008).  This burden means that a petitioner must point to specific case law decided by the United States Supreme Court and show how the state court decision was contrary to or an unreasonable application of such United States Supreme Court decisions.  Owsley v. Bowersox, 234 F.3d 1055, 1057 (8th Cir. 2000) ("To obtain habeas relief, Mr. Owsley must therefore be able to point to a Supreme Court precedent that he thinks the Missouri state courts acted contrary to or unreasonably applied.  We find that he has not met this burden in this appeal. Mr. Owsley's claims must be rejected because he cannot provide us with any Supreme Court opinion justifying his position."); West v. Foster, No. 07-CV-00021, 2010 WL 3636164, at *10 n.20 (D. Nev. Sept. 9, 2010) ("petitioner's burden under the AEDPA is to demonstrate that the decision of the Supreme Court of Nevada rejecting her claim 'was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*.' 28 U.S.C. § 2254(d)(1) (emphasis added).  Petitioner has not even begun to shoulder this burden with citation to apposite United States Supreme Court authority."), aff'd, 454 F. App'x 630 (9th Cir. 2011).

To the extent that a claim was fairly presented to the state courts but was not addressed on the merits, *de novo* review applies.  Cone v. Bell, 556 U.S. 449, 472 (2009).  The same review

applies to a claim that resulted from a state court decision that was contrary to or an unreasonable application of United States Supreme Court precedent and/or an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(1) and (2).

Here, AEDPA deference applies to each of remaining Grounds One, Two, and Three.  This Court will begin its analysis with Ground Two, for the purposes of organization.

### A. Ground Two

At Ground Two, Petitioner asserts:

Ground Two:     Evidence was insufficient not prove each and every element of criminal homicide beyond a reasonable doubt as required by the Sixth Amendment.

(a) Supporting facts [:]

The Commonwealth presented a witness who failed to make an in-court identification and whose testimony was so inconsistence and unreliable.

ECF No. 5 at 7.  Petitioner does not significantly elaborate on this claim in his brief.

The clearly established federal law for analyzing a sufficiency of the evidence claim is set forth in Jackson v. Virginia, where the United States Supreme Court held that "in a challenge to a state conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  443 U.S. 307, 324 (1979).  In a federal habeas corpus proceeding where the sufficiency of the evidence is in contention:

[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction ... does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt....   Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Id. at 318-19 (internal citations omitted) (emphasis in original).  See also Robertson v. Klem, 580 F.3d 159, 165 (3d Cir. 2009); Orban v. Vaughn, 123 F.3d 727, 731-33 (3d Cir. 1997).

In applying the <u>Jackson</u> standard, the reviewing court must consider each substantive element of the criminal offense at issue as defined under state law. <u>Coleman v. Jackson</u>, 566 U.S. 650, 655 (2012); <u>Jackson</u>, 443 U.S. at 324, n.16. "While the elements of a criminal conviction are to be defined by state law, a reviewing court's determination of whether sufficient evidence was produced to satisfy each element is governed by federal law." <u>Vaughter v. Fisher</u>, No. 12-CV-493, 2014 WL 1152540, at *15 (E.D. Pa. Mar. 24, 2014) (citing <u>Coleman</u>, 566 U.S. at 655). The <u>Jackson</u> standard is "deferential[,]" and "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts." <u>Coleman</u>, 566 U.S. at 655.

The United States Court of Appeals for the Third Circuit has found that the Pennsylvania state law test for sufficiency of the evidence challenges is identical to the federal standard set forth in <u>Jackson</u>. <u>See</u> <u>Evans</u>, 959 F.2d at 1233 ("the formulation of the Pennsylvania test for insufficiency of the evidence is almost identical to that under federal law").

As Respondents correctly argue in their Answer, ECF No. 23 at 29, the prosecution is required to prove the following three elements beyond a reasonable doubt in order to support a conviction of first degree murder under Pennsylvania law:

> (1) a human being was unlawfully killed;
>
> (2) the person accused is responsible for the killing; and
>
> (3) the accused acted with specific intent to kill.

<u>Com. v. Brown</u>, 987 A.2d 699, 705 (Pa. 2009). <u>See also</u> 18 Pa. C.S.C. § 2502(a). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa. C.S.A. § 2502(d). It appears that Petitioner attacks only the second element of the crime in Ground Two.

At trial, the prosecution presented the testimony of two individuals who had identified Petitioner as the victim's killer to police.  One witness, Ernest Wooley, who witnessed the killing, was unable to conclusively identify Petitioner as the killer at trial.

> Q   Would you stand, please?   Do you see the person in the courtroom you referred to in your testimony?
>
> A   Yes.
>
> Q   And where is that person?  Describe one article of clothing.
>
> A   Well, this person sitting right here.  He looks a little like the person, with the blue shirt on.
>
> Q   Is that the person or not?
>
> A   It was kind of hard to tell, you know, but – he looks like – looked like that there person.

Trial Tr. dated Jan. 15 and 21, 2009, at 65.

The other witness, David Wadley, positively identified Petitioner at trial.  Id. at 20.  In its opinion affirming Petitioner's conviction on direct appeal, the Superior Court addressed Wadley's testimony as follows.

> McCary challenges the sufficiency of the evidence underlying his conviction of first-degree murder on two bases. First, McCary claims that the Commonwealth's identification testimony failed to establish that he was the person who fatally injured Waller. *Id.* at 10. McCary contends that the Commonwealth's two eyewitnesses provided only equivocal identification testimony. *Id.* According to McCary, the first eyewitness initially told the police that he could not see the face of the assailant, but at trial stated "that he was now able to identify [McCary] as the attacker because of his eyes." *Id.* McCary further points out that the second eyewitness testified at trial that he did not see the assailant's face. *Id.*
>
> [***]
>
> Contrary to McCary's assertion, Wadley's testimony was sufficient to identify McCary as the person who had stabbed Waller. In his trial testimony, Wadley acknowledged that he did not identify McCary as Waller's attacker when questioned by police at the crime

scene. N.T., 1/15-21/09, at 28. When asked what information he had provided to police officers, Wadley responded as follows:

> Actually[,] not a whole lot of information. I went through what had happened just in brief. As far as identifying the guy or saying that I knew the guy, I was kind of hesitant at that particular time.
>
> I don't mean any harm, but Garfield's a rough area, okay, and you got to watch your P's and Q's, and you got to watch who you're around up there and what you say.

*Id.* at 28. During cross-examination, Wadley explained why he had failed to provide a Pittsburgh police detective with a description of the perpetrator:

> What I told Detective Pugh ... [is] that I didn't see anything pretty much. I didn't-at the time I didn't want to get involved because people were coming down from Penn Avenue walking down toward where the police were and I was and [Waller] was. And I know from experience not to say a whole lot, you know, when there's other people around like that.

*Id.* at 43. Wadley further stated the following:

> At that time, like I said, there were people coming down, and not to-not to be funny, but I was trying to hint around maybe I'll talk to you later. But I couldn't say those exact words.
>
> At that time[,] it was really touch and go, and there was [*sic*] too many people that talk too much that live in the street, and I don't trust my neighbor. I'm sorry. That's just how I am.

*Id.* at 44.

In court, however, Wadley positively identified McCary as the man who had stabbed Waller. *Id.* at 23, 24. Wadley testified that when McCary approached Waller, the area was lit by street lamps and that McCary's eyes were "wide and glowing." *Id.* at 20. In addition, on December 22, 2005, Wadley identified McCary from a photo array presented by police officers. *Id.* at 29. On February 7, 2008, Wadley again selected McCary's photograph from a photo array and identified McCary as the assailant. *Id.* at 31. Finally, during cross-

examination, Wadley explained that he recognized McCary, having observed McCary in the neighborhood on prior occasions:

> A day or so after, a few days after, I'm thinking about what happened, and his face just kept coming to my mind, and I'm thinking wait a minute. I've seen him in the area, you know, around the area.
>
> As a matter of fact, Penn-Aiken Dairy, there's a little corner grocery store, a little mom and pop store. They sell beer. They used to sell sandwiches and whatnot. And I've seen and heard of him having confrontations with the workers in there. I've seen him in the area.

*Id.* at 52.

> Based upon the foregoing, we conclude that McCary's challenge to the sufficiency of the identification evidence lacks merit. The Commonwealth's evidence established that Wadley had an adequate opportunity to view McCary during the incident, in an area lit by street lights, and that Wadley recognized McCary, previously having seen McCary in the neighborhood. Accordingly, we cannot grant McCary relief on this claim.

ECF No. 23-1 at 174-76.

Upon review, this Court find that the Superior Court's reasoning, through the lens of Jackson, was not an unreasonable application of Supreme Court precedent, or contrary thereto, or an unreasonable determination of the facts. Instead, the evidence, viewed in the light most favorable to the prosecution, supports the conclusion that Petitioner was the individual who killed the victim.

For the foregoing reasons, Ground Two will be denied.

**B.  Ground One**

At Ground One, Petitioner asserts the following:

Ground One:      Petitioner was denied his rights under the Sixth and Fourteenth Amendments wherein trial counsel failed to investigate psychiatric history procure mental health records and present a diminish [sic] capacity defense[.]

(a) Supporting facts[:]

Petitioner has an extensive history of mental illness.   Petitioner was discharged from mental health facility against medical advice (AMA). Within 24 hrs. the deadly assault occurred.  Essentially, on the eve of trial Counsel sought mental health records, yet still commenced with trial without the benefit of reviewing and investigating Petitioner's extensive mental health history[.]

ECF No. 5 at 5.  The bulk of Petitioner's Memorandum is directed toward this claim.  ECF No. 14.

The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)).  The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: (1) counsel's performance was unreasonable; and (2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687.  To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct.  Id. at 690.

The first prong of the Strickland test requires a petitioner to establish that his or her attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 688.  A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." Id. at 689.  The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the

time and place.  Id.  Petitioner is required to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Harrington v. Richter, 562 U.S. 86, 104 (2001) (quoting Strickland, 466 U.S. at 687).

The second prong of Strickland requires a petitioner to demonstrate that counsel's errors deprived him of a fair trial, and the result was unfair or unreliable.  Strickland, 466 U.S. at 689. To prove prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id. at 694. A "reasonable probability" is one that is sufficient to undermine confidence in the outcome.  Id.

In considering a claim of ineffectiveness of counsel, Pennsylvania uses a three-part effectiveness test.

> To plead and prove ineffective assistance of counsel a petitioner must establish: "(1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act." Commonwealth v. Stewart, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*).  The failure to meet any of these aspects of the ineffectiveness test results in the claim failing.  Id.

Future v. Ferguson, No. 16-2346, 2022 WL 2307095, at *8 (M.D. Pa. June 27, 2022), certificate of appealability denied sub nom. Future v. Sup't Benner Twp. SCI, No. 22-2419, 2022 WL 18536146, at *1 (3d Cir. Dec. 6, 2022).  The Third Circuit has found this test not to be contrary to Strickland.  Werts, 228 F.3d at 204.

Here, the Superior Court applied Pennsylvania's three-part test to Petitioner's claims of ineffective assistance of counsel.  McCary, 2020 WL 41924, at *3.  Accordingly, the Superior Court's analysis was not contrary to Strickland.

Petitioner argues that counsel's alleged deficient performance was so egregious that prejudice should be presumed.  ECF No. 14 at 20.  But this argument is not persuasive because the

Supreme Court has relieved a petitioner from the obligation to make an affirmative showing of prejudice in only a very narrow set of cases. They are: (1) when a defendant suffers an "[a]ctual or constructive denial of the assistance of counsel altogether[,]"; (2) "various kinds of state interference with counsel's assistance[,]" Strickland, 466 U.S. at 692 (citing United States v. Cronic, 466 U.S. 648, 659, and n.25 (1984)); and (3) "when counsel is burdened by an actual conflict of interest." Id.; see also, e.g., Barney v. Adm'r of New Jersey State Prisons, 48 F.4th 162, 165 (3d Cir. 2022). None of these circumstances apply here. Thus, the Superior Court's decision that Petitioner had to demonstrate prejudice, as defined by Strickland, in order to prevail on his claim of ineffective assistance, see McCary, 2020 WL 41924, at *2-3, was not "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1).

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Lewis v. Mazurkiewicz, 915 F.2d 106, 111 (3d Cir. 1990) (citing Strickland, 466 U.S. at 690-91). In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment. Kimmelman v. Morrison, 477 U.S. 365, 384 (1986).

Defense counsel may properly rely on information supplied by the defendant in determining the nature and scope of the needed pretrial investigation. Lewis, 915 F.2d at 111. As the Supreme Court stated in Strickland,

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such

information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. See United States v. Decoster, supra, at 372–373, 624 F.2d at 209–210.

Strickland, 466 U.S. at 691.

Further, as the Superior Court recognized, the defense of diminished capacity that Petitioner would have had raised is very limited under Pennsylvania law.

A defense of diminished capacity, whether grounded in mental defect or voluntary intoxication, is an extremely limited defense available only to those defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill. Commonwealth v. C. Williams, 602 Pa. 360, 980 A.2d 510, 527 (2009); [C]ommonwealth v. [G]ibson, 597 PA. 402, 951 [A].2d 1110, 1131 (2008); Commonwealth v. Spotz, 587 Pa. 1, 896 A.2d 1191, 1218 (2006) ("Absent an admission from [the defendant] that he had shot and killed [the victim], trial counsel could not have presented a diminished capacity defense.")[.] If a defendant does not admit that he killed the victim, but rather advances an innocence defense, then evidence on diminished capacity is inadmissible. Commonwealth v. Laird, 605 Pa. 137, 988 A.2d 618, 632 (2010).

McCary, 2020 WL 41924, at *6 (quoting Hutchinson, 25 A.3d at 312). Additionally,

[a] diminished capacity defense "does not exculpate the defendant from criminal liability entirely, but instead negates the element of specific intent." C. Williams, supra at 527 (citing Gibson, supra at 1131). For a defendant who proves a diminished capacity defense, first-degree murder is mitigated to third-degree murder. Commonwealth v. Saranchak, 581 Pa. 490, 866 A.2d 292, 299 (2005).

Hutchinson, 25 A.3d at 312. Furthermore,

31

> the authority to concede liability, which is an absolute prerequisite
> for a diminished capacity defense, rests solely and strictly with the
> accused.

Id.  See also Com. v. Weaver, 457 A.2d 505, 506-07 (1983) (holding that even if diminished

capacity was the only viable defense, trial counsel would be deemed ineffective for presenting this

defense without the consent of the defendant).

   Based on the Superior Court's opinion affirming the denial of post-conviction relief, as set

forth more thoroughly in Part I, supra, the undersigned cannot say that that court's determination

that counsel was not ineffective was contrary to, or an unreasonable application of Strickland.  Nor

has Petitioner demonstrated that the Superior Court's decision was based on an unreasonable

determination of the facts, or overcome the state court's presumption of correctness as to its

subsidiary factual findings.

   As a review of the state court record shows, Petitioner's case differs from prior cases where

trial counsel has been found to be ineffective for failing to investigate a criminal defendant's

mental health history in connection with a diminished capacity defense..  For example, in Jacobs

v. Horn, 395 F.3d 92 (3d Cir. 2005), the United States Court of Appeals for the Third Circuit

determined that trial counsel was ineffective for failing to adequately investigate the mental health

history of his client.  In that case, the petitioner was facing the death penalty for charges of first

degree murder of his girlfriend and their child.  Id. at 98.  Petitioner had admitted to killing his

girlfriend, but denied killing the child, and counsel presented heat of passion and diminished

capacity defenses at trial.  Id. at 102.  But "[a]pparently the only evidence of heat of passion or

diminished capacity presented at the guilt phase was Jacobs' own testimony that he 'lost it' and

stabbed [the victim] repeatedly upon seeing their baby drowned in the bathtub."  Id.  Counsel

arranged to have Jacobs evaluated by a psychiatrist, but declined to evaluate further after the

psychiatrist "reported orally to counsel that he found no evidence of major mental illness."

Id. at 98.

The Third Circuit determined in that case that:

> [a]t the time counsel decided not to investigate further, he knew or
> should have known from Jacobs' behavior and from his interactions
> with Jacobs that he should initiate some investigation "of a
> psychological or psychiatric nature." (PCRA Hearing Tr. 5/29/97 at
> 29:24). Counsel knew that Jacobs, a young man with no criminal
> history or history of violence, admitted to stabbing his girlfriend
> more than 200 times. Counsel knew that Jacobs faced the death
> penalty, yet did not inform Dr. Davis [who evaluated Jacobs] that
> the Commonwealth was seeking the death penalty, nor did he
> provide Davis with any background information concerning the
> crimes or Jacobs' history. Counsel interviewed Jacobs' mother
> before trial, but did not ask her any questions regarding Jacobs'
> mental health history, childhood, or background. In light of all that
> was known or made available to counsel, we conclude that Jacobs
> has satisfied the first prong of the Strickland test. He has
> demonstrated that counsel did not exercise reasonable professional
> judgment in failing to investigate further and discover evidence of
> Jacobs' mental retardation, brain damage, and other impairments
> that could have prevented him from forming the specific intent to
> kill Tammy Mock.

Id. at 102-03.

Another such case was Gorby v. Wetzel, 210 F. Supp. 3d 725 (W.D. Pa. 2016). In that

case, Gorby was convicted and sentenced to death for the murder and robbery of Drayton Sphar.

Id. at 728-29. The prosecution presented "overwhelming evidence establishing that Gorby had

committed the murder and robbery[,]" including the testimony from Gorby's girlfriend that he had

confessed to committing the murder the same day, and had some of Sphar's possessions at the

time. Id. at 728-30. The girlfriend's testimony was a surprise to counsel, who initially thought

that she would not testify, and only learned that she would do so during trial. Id. at 734.

In his federal habeas proceeding, Gorby asserted that his trial counsel was ineffective for

"failing to reasonably investigate, develop, and present a diminished capacity defense that

complemented the voluntary intoxication defense upon which the jury was instructed at trial." Id.

at 732.  Importantly, unlike the present matter, Gorby's claim of ineffective assistance of counsel

was not subject to the AEDPA's extremely deferential standard of review.  Id. at 731 n.2.  Thus,

the district court held a hearing on Gorby's claims, at which counsel and Gorby testified.

> [Trial counsel] Chunko testified that the Commonwealth evidence was almost entirely circumstantial. The primary Commonwealth witness was Susan Loveland ("Loveland"), who testified that Gorby had admitted to her that he had killed the victim. Chunko testified he thought that "we could have won if Susan Loveland had not testified." Id. at 23. ("Without Susan Loveland, we had a 50-50 chance or better of prevailing on first-degree murder.") According to Chunko, prior to trial, Loveland had given a number of factually inconsistent statements, none of which inculpated Gorby. Chunko considered her an unreliable witness, as she had given approximately seven or eight statements in total, and "[t]hey were to some extent inconsistent factually." Id. at 34. He had interviewed her twice and both times she stated she would not testify against Gorby. Id. at 24. Chunko learned for the first time during trial that Susan Loveland was going to testify unfavorably towards his client. This came as a surprise to him because up until that point, it was his understanding that she would not testify. Id. at 30. Additionally, according to Chunko, prior to trial, Chunko was not aware that his client had confessed to her. Id. at 31.
>
> Chunko testified that he did not seek a continuance of the trial after learning that Loveland had changed her testimony. When asked if anything prevented him from seeking a continuance at that point, Chunko replied:
>
> > She was the last witness, other than Trooper Luppino, that the Commonwealth I believe had called, so we were already in the fourth day or fifth day of trial at that time. The answer is no. I mean, I could have requested a continuance, but realistically, knowing what she was going to testify then, I did my best to cross-examine her.
>
> Id. at 27.

Id. at 734.  Additionally,

> Chunko testified that at some point during the trial, Gorby admitted to him that he had killed Sphar. Chunko could not recall the exact

date Gorby made the admission, but remembered that "we were in the trenches at the time the confession was made." Id. at 22. Although he could not recall specifically when the admission was made, he did recall that it "was right around the time [Susan Loveland] testified. It was probably at least the fourth or fifth day of trial," id. at 31, and "would have been at the cell we usually used to discuss the case at the Washington County Jail." Id. at 19.

Id.

Chunko testified that at the time of trial, he did not have any reason to suspect that diminished capacity factors may be present, but acknowledged, "[l]ooking in hindsight, sure, but at that time I don't believe that I did or I would have pursued it." Id. at 33.

Id. at 735-36.

Gorby also testified at the hearing in the federal habeas case.

Gorby recalled meeting Chunko sometime after his preliminary hearing, between May 10 and June 20, 1986, the date of his formal arraignment. He testified that he met with Chunko five times prior to trial. Gorby testified that he told Chunko "everything" about his background—that he "had been abused as a kid, you know, and basically where I ended up at, where I was at, drinking and drugs. It was nothing really specific." Id. at 39. Gorby told Chunko to contact his mother and she could confirm his background. Id.

> Gorby testified that he confessed to the crime to Chunko as soon as he came on the case; that he never denied guilt to his attorney. Id. at 39–40. He testified that he confessed to Chunko while he was at the Washington County Jail:
>
> I told him as much as I could recollect of the night in question. I did the crime, I mean, you know. I didn't invite Mr. Sphar out to kill him or rob him, but that I had committed the crime of killing him.

Id. at 45. Gorby testified that the topic of his guilt came up with Chunko a couple of times prior to trial. Id. Gorby testified that he learned on August 29, 1986, that the District Attorney was seeking the death penalty.

He testified that he told Chunko before trial that he had confessed to Loveland that he had killed Sphar. Id. at 41.

35

According to Gorby, he was told by Chunko that he was "going for a third-degree homicide" and that his defense would be that he had committed the crime and was drunk and intoxicated on the night of the crime. Id. at 40–41. Gorby testified that at the time of trial had Chunko explained to him that it would be necessary for Gorby to admit guilt for a voluntary intoxication defense, he would have given permission for Chunko to pursue this defense, even if it put him at risk for a life sentence. Id. at 41, 42.

Gorby testified that Chunko never discussed with him the possibility of pursuing a diminished capacity defense; rather, Gorby was advised that because he was intoxicated and on drugs, "it would negate it down to third-degree homicide." Id. at 42. Gorby described his understanding of his defense as follows:

> It was just as simple as I thought that I had committed the crime, and because I was the way I was the night of the crime and couldn't remember most parts of it, that I was going to get third-degree homicide.

Id. at 42. Gorby testified that prior to trial, Chunko told him nothing about a diminished capacity due to mental defect defense. Had he been informed of this defense, Gorby would have given Chunko permission to pursue it, even if it put him at risk for a second-degree murder conviction and the risk of a life sentence. Id. at 42–43.

Id. at 736.

The facts in Gorby and Jacobs substantially differ from those in the present habeas case in important ways. First, unlike the present case, both Gorby and Jacobs involve petitioners who admitted to the killing. While Gorby admitted it to counsel – either late in trial, as counsel testified, or early on as Gorby testified – that differs significantly from Petitioner's position according to the state court record, which was to maintain his actual innocence to counsel in preparing for trial, at trial, on direct appeal, and through the conclusion of his PCRA proceedings.

Indeed even Petitioner's expert Dr. Applegate testified at the PCRA hearing that Petitioner denied committing the crime. Competency Hr'g and PCRA Hr'g dated Dec. 11-12, 2018, at 154 ("The defendant said he didn't do it."); id. at 154-55 ("He's denying - - he doesn't remember it. He doesn't remember it. He says he didn't do it."); id. at 155 ("His account is that he didn't do

it.").  This is consistent with each expert witness' reports, which rely prior statements of Petitioner as they appear in medical records that were evaluated during their preparation.  See Report of Bruce Wright, M.D., dated Mar. 6, 2018, at 19 ("Mr. McCary has, somewhat inconsistently, claimed both that he 'has no recall of the murder' and that he is in jail 'for a crime I didn't commit.'") (internal footnotes and citations omitted).  See also Report of Alice Applegate, Ph.D., dated Apr. 27, 2015, at 3 ("When asked why he was incarcerated, Michael answered "because they said I hurt somebody.  I didn't do it.  I didn't do it.  The guy – Dave – He lied on me.  We was getting high.  We was getting high.  I took his coke from him.'").

Dr. Applegate's testimony that Petitioner denied involvement in the killings also is consistent with prior statements that Petitioner had made denying his guilt.  See Grazier Hr'g Tr. dated Dec. 16, 2010, at 6 ("Reason you why [sic] you chose to find me guilty of a crime I did not commit, only you and God knows that, but my only thing is like you took the evidence in the light most favorable to the Commonwealth when I thought that I was supposed to have a fair trial, and that played a big impact, sir, on the outcome of my case because I should have been acquitted, but the district attorney asked you to do him a favor and to the Commonwealth a favor and deny my motion for acquittal in the light most favorable to the Commonwealth.").  See also Sentencing Hr'g dated Apr. 20, 2019, at 2 (MR. SEMAN: […] So as far as sentencing, I don't have very much put together because [Petitioner] is maintaining innocence.").  See also Trial Tr. dated Jan. 15 and 21, 2009, at 118 ((upon being found guilty) "THE DEFENDANT: Oh, my God!  They said - - both witness' testimony, they said they didn't see my face!").

Second, unlike in Gorby and Jacobs, there is no evidence in the record that Petitioner even would have been amenable to admitting involvement in the killings in order to raise a viable diminished capacity defense.  As stated above, Jacobs admitted killing his girlfriend at trial, and

relied on the defense.  Gorby testified that he would have given his counsel permission to pursue the diminished capacity defense had he been informed of it.  No such evidence exists on the record properly before this Court that Petitioner would have been willing to admit his involvement in the killing in order to peruse the diminished capacity defense.  Instead, the state court record indicates that Petitioner – who was found competent to assist with his defense – maintained his innocence to his trial counsel, and refused to admit any culpability to pursue a lesser charge.  <u>See</u> Competency Hr'g and PCRA Hr'g dated Dec 11-12, 2018, at 220 and 228.[8]

Further, the evidence against Petitioner was not "overwhelming," as it was in <u>Gorby</u>, and ultimately rested on a single eye-witness who was able to identify Petitioner in court, and who initially stated to police that he had not seen the perpetrator's face at the time of the killing.  There is no indication on the record that, when presented with the evidence used to convict Petitioner, counsel should have doubted that Petitioner's assertion of innocence was the result of incapacity or mental illness.

In light of trial counsel's testimony that Petitioner was involved in strategizing his defense, his unwillingness to admit involvement when voluntary manslaughter was discussed, his insistence that he was not involved in the crime, the finding of Petitioner's competency at the time of trial, and the nature of the evidence against Petitioner, we cannot say that the state court's determination was unreasonable either legally or factually.  Accordingly, Ground One will be denied.

---

[8] In his Memorandum, Petitioner argues that prior statements to counsel that "he did not remember committing the crime he was charged with" was an admission of guilt. ECF No. 14 at 16-17.  But this is belied by the state court record, as recited above.  Further, to the extent this argument can be construed as "evidence" at all, it is not properly before this Court because it was not raised at the state court. 28 U.S.C. § 2254(e)(2).

**C. Ground Three**

To the extent that Petitioner's memorandum can be construed as asserting additional bases for federal habeas relief, the following has been construed as Ground Three by Respondents:

> Ground Three:   The PCRA Court erred in denying Petitioner's PCRA petition.

See ECF No. 14 at 8.

This Court's ability to grant habeas relief is limited to violations of the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Claims of error by the PCRA trial Court or PCRA Superior Court – such as failing to exercise the state court's inherent powers, or failing to hold a hearing on a PCRA petition – simply are not cognizable in a federal habeas action. See, e.g., Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998) ("The federal courts are authorized to provide collateral relief where a petitioner is in state custody or under a federal sentence imposed in violation of the Constitution or the laws or treaties of the United States. 28 U.S.C. §§ 2254, 2255. Thus, the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's *collateral* proceeding does not enter into the habeas calculation.") See also Lambert, 387 F.3d at 247 ("habeas proceedings are not the appropriate forum for Lambert to pursue claims of error at the PCRA proceeding.") Accordingly, habeas relief based on error in the PCRA proceedings, as is at least arguably asserted by Petitioner, will be denied.

**V.   CERTIFICATE OF APPEALABILITY**

A certificate of appealability will be denied, as jurists of reason would not debate that Petitioner has failed to show entitlement to relief. See Slack v. McDaniel, 529 U.S. 473, 484-85 (2000).

## VI.   CONCLUSION

For the reasons set forth above, the Petition, ECF No. 5, will be denied.  Also, a certificate of appealability will be denied.

Dated: August _29_ , 2024

BY THE COURT,

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc:    Michael La Shawn McCary
JA-5048
SCI Benner Township
301 Institution Drive
Bellefonte, PA 16823

All counsel of record (*via* CM/ECF)